

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION

| | |
|---|---|
| WILLIAM R. MARTIN, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AAIPHARMA INC., CIRCLE TRUST COMPANY, INVESMART ADVISORS, INC., WILLIAM L. GINNA, and JOHN DOES NOS. 1-100,<br>Defendants. | Civil Action No.: 7:04-CV-78-F(3<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, William R. Martin ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding aaiPharma, Inc. ("aaiPharma" or the "Company"), securities analysts' reports about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiff brings this action as a Class Action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the aaiPharma Inc. Retirement

and Savings Plan (the "Savings Plan" or "Plan") and a Class of all persons who are or were participants or beneficiaries of the Savings Plan during the period from April 24, 2002 to March 31, 2004 (the "Class Period"), seeking to pursue remedies under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1) and personal jurisdiction over the Defendants pursuant to Fed R. Civ. P. 4.

3.     Venue is properly laid in this district pursuant to ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)) because Defendant Circle Trust Company is headquartered in this district.

## PARTIES

4.     Plaintiff William R. Martin is a resident of Hawaii is a former participant in the Plan and current beneficiary of the pension account of Plan participant Deborah E. Martin (formerly known as Deborah E. Peck and Deborah E. Lewis) in the aaiPharma Inc. Retirement and Savings Plan and has suffered damages as a result of the wrongful acts of defendants as alleged herein.

5.     Defendant aaiPharma is a Delaware corporation that maintains office within this Judicial District at 2320 Scientific Park Drive, Wilmington, NC 28405. aaiPharma was and is the "plan sponsor" and thus a "named fiduciary," of the Savings Plan within the meaning of 29 U.S.C. § 1002(21)(A).   aaiPharma's principal place of business is 2320 Scientific Park Dr., Wilmington, NC 28405-1800.

6.     Defendant William L. Ginna, Jr. ("Ginna") was, during the Class Period, and at all times relevant hereto, the Company's Executive Vice President and Chief Operating Officer. Defendant Ginna signed the Savings Plan's Internal Revenue Service Form 5500 for the year

ending December 31, 2001 in his capacity as the plan administrator. As such, he was also a fiduciary of the Savings Plan within the meaning of ERISA (29 U.S.C. § 1002(21)(A)).

7.      Defendant John Does Nos. 1-100 ("Does") were at all relevant times members of the aaiPharma committee responsible for overseeing the Savings Plan. As such, they were also Savings Plan fiduciaries within the meaning of ERISA (29 U.S.C. § 1002(21)(A)).

8.      The Defendants identified above are sometimes herein referred to as the "aaiPharma Defendants." The aaiPharma Defendants were fiduciaries with respect to the Savings Plan in that they each exercised control respecting management of the Savings Plan's assets, rendered investment advice for a fee or other compensation or had authority to do so, and had discretionary authority or responsibility in the administration of the Savings Plan. 29 U.S.C. § 1002(21)(A).

9.      Defendant Invesmart Advisors, Inc. ("Invesmart") is a retirement financial services firm and wholly owned subsidiary of Invesmart, Inc., a Delaware corporation. During the Class Period, Invesmart provided investment advisory services to the Savings Plan and derived fee based compensation. Invesmart is headquartered at Penn Center West 6, Suite 211, Pittsburgh, PA 15276. It is a fiduciary of the Savings Plan within the meaning of ERISA (29 U.S.C. § 1002(21)(A)).

10.     Defendant Circle Trust Company ("Circle Trust") is the Trustee for the Savings Plan and, as such, was and is a fiduciary of the Savings Plan within the meaning of ERISA (29 U.S.C. § 1002(21)(A)). Circle Trust, a subsidiary of Orbitex Financial Services Group, Inc., manages over $9 Billion in assets and offers 401(K)/mutual fund, custody/trust, assets and endowments management to individuals and institutions. Circle Trust's headquarters are located at Metro Center, One Station Place, Stamford, CT 06902.

## CLASS ACTION ALLEGATIONS

11.     Plaintiffs bring this action as a Class Action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the aaiPharma Retirement and Savings Plan (the "Savings Plan") and all persons who are or were participants or beneficiaries of the Savings Plan during the period from April 24, 2002 to March 31, 2004 (the "Class Period"). Excluded from the Class are Defendants or any member of their immediate families and any member of aaiPharma's senior management group.

12.     The Class consists of over one thousand persons located throughout the United States. Thus, the members of the Class are so numerous that joinder of all Class members in impracticable. The exact number of Class members is not presently known to plaintiffs, but can readily be determined by appropriate discovery.

13.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and ERISA litigation. Plaintiffs have no interests that are adverse or antagonistic to those of the Class.

14.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to individually seek redress for the wrongful conduct alleged herein.

15.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether ERISA was violated by Defendants' acts and omissions, as alleged herein;

(b)    Whether Defendants breached fiduciary duties owed to plaintiffs and the members of the Class by failing to act prudently and solely in the interest of the Savings Plan participants and beneficiaries; and

(c)    Whether and to what extent plaintiffs and the members of the Class have sustained injury by reason of Defendant's actions and omissions.

16.    Plaintiffs envision no difficulty in the management of this litigation as a Class Action.

## SUBSTANTIVE ALLEGATIONS

### Background

17.    aaiPharma Inc. is a science-based specialty pharmaceutical company focused on the commercialization of branded pharmaceutical products that it develops or acquires. The Company has operations primarily in the United States and Europe.

18.    The Company acquired three branded product lines since August 2001: the M.V.I. and Aquasol family of products, Brethine, and the Darvon and Darvocet family of products. In addition, it is developing its own proprietary products, as well as developing improvements and line extensions to its acquired products.

19.    The Company operates through its Pharmaceuticals Division, Research and Development Division and AA International and employs in excess of 1000 persons worldwide.

20.    The Company provides retirement benefits for all domestic aaiPharma employees with one year of service through the aaiPharma Inc. Retirement and Savings Plan (the "Savings Plan"). The Savings Plan is a defined contribution plan qualified under section 401(k) of the

Internal Revenue Code of 1986, and eligible individual account Plan within the meaning of ERISA § 407 (29 U.S.C. § 1107) and qualified cash or deferred arrangement within the meaning of IRC § 401(k) (26 U.S.C. § 401(k)).

21. Participants in the Savings Plan may elect to contribute a portion of their annual compensation to the Plan, subject to limitations. The Company makes matching contributions, but only in aaiPharma stock, equal to 50% of a participant's contribution up to a certain amount. Additionally, the Company makes profit-sharing contributions at the discretion of the Board of Directors. Participants in the Savings Plan may contribute a limited portion of their eligible base pay in any combination of before-tax salary deferrals or after-tax contributions subject to certain limits. Participants may also roll over amounts representing distributions from other qualified Plans.

### False and Misleading Statements Made to Savings Plan Participants

22. On April 24, 2002, AaiPharma issued a press release announcing a dramatic increase in revenue. The press release stated:

**Financial Review:**

For the first quarter of 2002, total revenues increased 51% to $45.6 million versus $30.2 million in the same quarter a year ago. Product-related revenues more than tripled to $22.3 million from $6.2 million in last years first quarter. AaiPharma's AAI International business generated research revenues of $23.3 million in the first quarter of 2002.

Income for the 2002 first quarter, excluding an extraordinary item, rose to $2.1 million, or $0.11 per diluted share, compared to $0.8 million, or $0.05 per diluted share in last years first quarter. During the 2002 first quarter, the Company incurred an extraordinary charge, net of tax, of $5.3 million, or ($0.28) per diluted share, due to the write-off of expenses related to its prior senior credit facilities and redeemable warrants related to prior acquisitions. Including this extraordinary item, the Company reported a net loss of $3.3 million, or ($0.17) per diluted share, in the 2002 first quarter.

Gross margin for the first quarter of 2002 improved to $23.4 million, or 51% of revenues, from $14.7 million, or 49% of revenues, in last years first quarter. As a percentage of total revenues, SG&A expenses decreased to 30% from 37% in the prior years first quarter. Research and development expenses in the 2002 first quarter were $4.5 million, or 10% of revenues, compared to $2.3 million in the 2001 period.

The Company's revenue growth and improved profitability in the first quarter reflect a shift in revenue mix consistent with its continued expansion as a science-based specialty pharmaceutical company. AaiPharma's pharmaceutical product sales increased significantly, representing 44% of total revenues, versus 8% in the year-ago period. This growth reflects the contributions of sales in the Company's M.V.I.® and Aquasol™ product lines, as well as a full quarter of Brethine® sales, which the Company acquired from Novartis Pharmaceuticals Corporation in the latter part of the 2001 fourth quarter.

Commenting on the financial results, defendant Ginna stated:

Bill Ginna, Executive Vice President and Chief Financial Officer of AaiPharma, stated, Our positive first quarter results reinforce AaiPharma's evolution as a science-based specialty pharmaceutical company. Product related revenues now represent 49% of total revenues, versus 20% in the first quarter of last year. Going forward, this shift in revenue mix will continue, as we begin to recognize sales of our recently acquired Darvon® and Darvocet N® product lines. During the quarter, we leveraged our existing infrastructure as we grew sales, resulting in a reduction of SG&A costs as a percentage of revenues.

Defendant Sancilio added:

We are very pleased with our accomplishments in the first quarter of 2002, as the benefits of successful execution of our operating strategy can be seen in our financial results. We look forward to continued growth throughout 2002.

24. In the April 24, 2002 press release, defendants highlighted "first quarter accomplishments" stating:

- The successful acquisition of the United States rights to the Darvon® and Darvocet N® family of pain products from Eli Lilly and Company (NYSE: LLY) in late March 2002. The Darvon® and Darvocet N® family of pain products are indicated for the treatment of mild to moderate pain. The Company will begin recording sales from this acquisition in the second quarter of this year.

- Completed financing for the above-mentioned acquisition. To fund the acquisition, the Company increased its senior secured credit facilities to $175 million and issued $175 million of senior subordinated notes due in 2010.

23.     On May 15, 2002, defendants filed a quarterly report on Form 10-Q, which repeated the financial results, detailed above. Defendant Ginna signed the report.

24.     On July 24, 2002, defendants issued a press release announcing "record" earnings and revenue for the second quarter of 2002. The press release stated:

> Total revenues for the second quarter of 2002 were $61.4 million, an increase of 106% versus total revenues of $29.9 million in the second quarter of last year. Pharmaceutical product sales for the second quarter totaled $34.7 million versus $2.1 million in the year ago period. Product development (royalties and fees) revenues totaled $6.5 million versus $5.0 million in the year ago period. Total product-related revenues increased to $41.1 million, compared with $7.1 million in the 2001 period.
>
> For the second quarter of 2002, the Company reported net income of $6.1 million, or $0.32 per diluted share, a significant increase over net income in the year ago period of $1.0 million, or $0.06 per diluted share.
>
> Gross margin for the second quarter of 2002 improved 170% to $39.4 million, compared with $14.6 million last year. As a percentage of revenues, gross margins improved to 64% from 49% a year ago. SG&A expenses were 28% of total revenues, versus 31% in the prior years second quarter. Research and development expenses in the second quarter of 2002 were $5.6 million, or 9% of revenues.
>
> **AaiPharma's second quarter product related revenues reflect the positive impact of increased pharmaceutical product sales and the overall shift in the Company's revenue mix to the higher-margin product sales business. Driven by solid sales across AaiPharma's M.V.I.®, Aquasol(TM) and Brethine® product lines, and including the Company's first ever sales of the Darvon® and Darvocet N® family of pain products since the acquisition, product-related revenues accounted for 67% of total revenues, compared to 24% in the year ago period. Revenues in the Company's AAI International division, which totaled $20.3 million in the second quarter, accounted for 33% of total revenues, compared to 76% in the prior year. This revenue shift is consistent with the Company's stated strategy.**
>
> For the 2002 six-month period, revenues increased 78% to $107.1 million, compared with revenues of $60.1 million in the first half of 2001. Product-related revenues increased 378% to $63.5 million in the first six months of 2002. The Company reported net income of $8.2 million for the first half of 2002, or $0.43 per diluted share, before an extraordinary loss, an increase of 348% over net income in the year ago period of $1.8 million, or $0.10 per diluted share. During the first quarter of 2002, the Company incurred an extraordinary loss, net of tax, of $5.3 million, or ($0.28) per diluted share, due to the previously announced

write-off of expenses related to its prior senior credit facilities and redeemable warrants related to prior acquisitions. Including this extraordinary item, the Company reported net income for the first half of 2002 of $2.9 million, or $0.15 per diluted share.

Bill Ginna, Executive Vice President and Chief Financial Officer of AaiPharma, stated, **we are very pleased with our results for the quarter and the first half of the year, which include the profitability benefit of a revenue mix rapidly shifting toward higher-margin pharmaceutical products. In addition to our strong earnings performance during the period, we were able to generate significant operating cash flow, which helped us pay down $18 million in debt during the quarter. Our earnings results this quarter exceeded previous guidance due to outstanding operations results and also the positive benefit of lower amortization expense associated with finalization of the purchase price allocation analysis of the recent acquisition of the Darvon® and Darvocet N® pain products.** This factor contributed approximately $0.05 to the Company's earnings per share during the second quarter. Overall, the Company continues to be in a positive financial position to achieve its goals.

Dr. Philip S. Tabbiner, President and Chief Executive Officer of AaiPharma, commented, the second quarter saw the Company continue to execute on our operating strategy. We committed to focusing on increasing gross margin, driving our pharmaceutical product sales and progressing with our pipeline, and we clearly delivered on these commitments in this quarter. **In the Pharmaceuticals Division, we achieved very strong sales across all of our pharmaceutical brands, and began the active detailing and promotion of the Darvon® and Darvocet N® product lines in late June.**

The press release further stated:

**Outlook:**
As a direct result of lower amortization expense related to the acquisition of the Darvon® and Darvocet N® family of pain products, the Company is increasing its diluted earnings per share guidance for 2002 to between $1.17 and $1.22 per diluted share, before the extraordinary item. The Company continues to expect revenues for 2002 to be between $230 million and $235 million. For 2003, the Company continues to expect revenues to be between $270 million and $275 million, and is increasing its earnings per share guidance to between $1.48 and $1.53 per diluted share, to account for the aforementioned lower amortization expense.

Based on current trends and the continuing implementation of its strategy, AaiPharma expects revenues for the third quarter of 2002 to be between $61 million and $63 million, and diluted earnings per share to be between $0.36 and $0.38.

25.    On August 14, 2002, defendants filed a quarterly report on Form 10-Q which repeated the financial results detailed above.  The 10-Q was signed by Ginna, and included a Sarbanes-Oxley certification[1] which stated:

> The undersigned officers of the registrant certify that the Quarterly report on Form 10-Q for the Quarterly period ending September 30, 2003 fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 780(d)) and that information contained in this report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

26.    On November 14, 2002, defendants filed aaiPharma's quarterly report on Form 10-Q for the third quarter of fiscal year 2002, signed by Ginna.  The financial results detailed in the 10-Q were materially false and misleading as detailed below.

27.    On January 28, 2003, defendants issued a press release announcing:

> Total revenues for the fourth quarter of 2002 were a record $62.2 million, an increase of 35% over revenues of $46.1 million in the fourth quarter of 2001. Pharmaceutical products continued to drive this favorable trend, with quarterly sales of $37.7 million, up 133% as compared to $16.2 million in last years fourth quarter.  For the quarter, the Company reported record net income of $7.4 million, or $0.39 per diluted share, an increase of 117% over net income of $3.4 million, or $0.18 per diluted share, in the 2001 fourth quarter.

> For the year ended December 31, 2002, total revenues reached an all-time high of $230.5 million compared to total revenues of $141.1 million in 2001, an increase of 63%.  Total product-related revenues for the 2002 full-year period were $148.1 million, versus $47.9 million in the year ago period.  Before an extraordinary loss, the Company reported net income for the 2002 full-year period of $22.7 million, or $1.20 per diluted share, a 281% increase over net income of $5.9 million, or $0.32 per diluted share, a year ago.  During the first quarter of 2002, the Company incurred an extraordinary loss, net of tax, of $5.3 million, or ($0.28) per diluted share, due to the previously announced write-off of expenses related to the refinancing of certain senior credit facilities and redeemable warrants for prior product acquisitions.  Including this extraordinary item, the Company reported net income for the 2002 full-year period of $17.3 million, or $0.92 per diluted share. During the year, the Company generated $28.1 million of net operating cash flow. In addition, the Company repaid $51.9 million of senior bank debt, providing for $27.5 million in borrowing availability at year-end.  As a result, the total leverage

---

[1] These certifications were also included in all of aaiPharma's SEC filings after August 14, 2002.

ratio at year-end was 3.5x, compared to 4.2x at March 31, 2002. At December 31, 2002, AaiPharma's cash position was $6.5 million.

Our fourth quarter and full-year results reflect the continuing shift in revenue mix to include significantly larger amounts of higher-margin pharmaceutical product sales which drive sustainable profitability growth, commented Dr. Philip S. Tabbiner, President and Chief Executive Officer of AaiPharma. The successful execution of our sales and marketing strategy resulted in continued strong performance from the Darvon® and Darvocet-N® family of products, with recent IMS market data indicating that these products share of the extended units market for propoxyphene has steadily increased since June 2002 from 5.3% to 6.3% in November of 2002. Sales of our M.V.I.®, Aquasol™ and Brethine® product lines also continued to perform ahead of expectations during the 2002 fourth quarter.

**Outlook**

For the first quarter of 2003, the Company expects revenues of between $62 and $65 million and earnings per diluted share of between $0.35 and $0.38. The Company continues to expect full year 2003 revenues and earnings per diluted share to be between $270 million and $275 million, and between $1.53 and $1.58 per share, respectively.

29. On April 21, 2003, aaiPharma issued a press release announcing first quarter 2003 results. The press release stated:

Total revenues for the first quarter of 2003 increased 40% to $64.0 million, compared with $45.6 million reported for the first quarter of 2002. For the quarter, the Company reported net income of $7.2 million, or $0.25 per diluted share, as compared to income before extraordinary loss of $2.1 million, or $0.07 per diluted share, in the 2002 first quarter.

Dr. Philip S. Tabbiner, President and Chief Executive Officer, stated, "In addition to *AaiPharma*'s strong financial performance for the first quarter, the Company achieved several key milestones with the expansion of our sales force to 80 professionals as well as the marketing approval and launch of Azasan 75 and 100 mg and our Calcitriol vial. In addition, the Company is on track to launch its first Darvon line extension and file a supplemental new drug application (sNDA) for Brethine in the second quarter. Azasan, Calcitriol and our pain management line extensions as well as continued success with our core brands will be drivers of the Company's organic revenues growth over the next three quarters."

**Financial Results**

Product sales revenues of $40.0 million increased 98% during the first quarter of

2003 versus the first quarter of 2002, primarily due to sales of the Darvon/Darvocet-N family of products, which the Company acquired in late March of 2002. Gross margins for pharmaceutical products were 75% for the first quarter ended March 31, 2003, reflecting an improvement of approximately 14 percentage points versus the prior year quarter, primarily due to sales mix.

Product development revenues (royalties and fees) for the first quarter of 2003 represented 6% of overall Company revenues, or $3.8 million, as compared to $2.1 million for the first quarter of 2002. Product development revenues remain in line with management's expectations. Development services revenues for the first quarter of 2003 were $20.2 million, as compared to $23.3 million in the prior year period.

While in absolute terms, selling, general and administrative expenses were higher than the prior year quarter, on a percentage of revenues basis, they represented 28% percent in the quarter, compared to 29% in the prior year quarter.

Income from operations for the first quarter of 2003 increased by $12.1 million, versus the first quarter of 2002, to $17.2 million and was 27% of revenues. Net cash provided by operating activities for the first quarter of 2003 was $15.3 million.

Days' sales outstanding (DSOs) were a record low of 40 days at March 31, 2003, improving upon the prior record of 44 days established at December 31, 2002. Since March 31, 2002, the Company has repaid $60.4 million of senior bank debt, including an additional $8.5 million during the first quarter of 2003, providing $34.0 million in borrowing availability as of March 31, 2003. The total leverage ratio, or total debt divided by income from operations plus depreciation and amortization, at quarter-end was 3.4x, compared to 4.2x at March 31, 2002.

At March 31, 2003, *aaiPharma*'s cash position was $10.7 million.

**Outlook**
*aaiPharma* also updated its financial guidance for 2003 as follows:

| Revenues and Earnings Per Share (EPS) Guidance | Q2 2003 Ranges | Full Year 2003 Ranges |
|---|---|---|
| Product Sales: | | (millions) |
| Pain Management | | $65 to $67 |
| Critical Care | | $106 to $110 |
| Commercial Manufacturing | | $4 to $5 |
| Product Development | | $14 to $15 |
| Development Services | | $91 to $93 |
| **Total Revenues** | | **$280 to $290** |

| | | | |
|---|---|---|---|
| Diluted EPS | $0.26 to $0.28 | $1.11 | to $1.17 |

28.　On June 30, 2003, aaiPharma reported record financial results for the second quarter ended June 30, 2003. Total revenues for the second quarter were $70.8 million, representing organic growth of 15% above the $61.4 million recorded in the second quarter of 2002. For the six-month period ended June 30, 2003, revenues increased 26% to $134.8 million, compared with revenues of $107.1 million in the first half of 2002. Net income and earnings per diluted share increased 31% to $8.0 million and 33% to $0.28, respectively, as compared to the second quarter of 2002, driven by a continued shift toward higher margin pharmaceutical products. The Company reported net income of $15.1 million for the first half of 2003, or $0.53 per diluted share, an increase of 85% over income before extraordinary loss in the year ago period of $8.2 million, or $0.29 per diluted share.

29.　Commenting on these results, Tabbiner stated:

"Our positive second quarter financial performance was driven by strong revenue growth in our pharmaceutical products division," stated Dr. Philip S. Tabbiner, President and Chief Executive Officer. **"We are very pleased with the strategic and operational milestones we achieved in the first six months of 2003 which reflect our continued focus on our core strategy of being a science-based, specialty pharmaceutical company."** (Emphasis added.)

30.　On July 24, 2003, the Company held a conference call with investors and analysts. During the conference call, the Company again reiterated its previously announced financial results. Commenting on the Company's current inventory levels, Tabbiner stated:

Now looking at overall market dynamics, we continue to see market share gains for M.V.I. pediatric based on our low aluminum benefits, the solid demand for our semi-exclusive Darvon products, and increased demand for our Brethine indictable brand. As a result of the steady demand for our brands, overall marketplace inventories across all brands are well within desired levels. Entering June, M.V.I. pediatric was below our targeted levels, with an inventory of less than one week at some distributors. These inventories were replenished during

the month of June as strong demand for this important product continues. According to our market research, M.V.I. pediatrics' market share has moved from 33% in December 2002 to 72% in June 2003.

Inventory levels for Darvocet N100, our largest product, remains on track. We currently have less than six weeks of inventory in the channel for this, our high demand 100mg by 100 tablet pack. Inventory levels for Brethine 10 pack, our highest demand SKU for this brand, are below desired levels with less than 4 weeks of inventory in the channel. Due to steady increases in demand for the 10 packs versus the 100 packs, we have discontinued the Brethine 100 pack product from the marketplace. Current inventory levels reflect the last remaining supply available for this SKU, and are in line with our expectations in light of the discontinuation.

31.    On August 5, 2003, aaiPharma and CIMA Labs Inc. ("CIMA") announced that they had signed a definitive merger agreement. Under the terms of the merger agreement, each share of aaiPharma common stock would be exchanged for 1.0 share of the new company's common stock. Each share of CIMA common stock would be exchanged for 1.3657 shares of the new company's common stock. At inception, aaiPharma stockholders would own 59.4 percent of the combined company and CIMA stockholders would own 40.6 percent. The transaction was structured to be tax-free to the stockholders of each company.

32.    Commenting on the merger, Tabbiner stated:

"This merger creates a specialty pharmaceutical company with substantial intellectual property and R&D capabilities[.]" ... "By combining with CIMA, we are building upon our science base by adding attractive proprietary technologies that we believe can be applied to our acquired brands to accelerate pipeline development and drive organic revenue growth. At the same time, with a strengthened balance sheet, the combined company will be well-positioned to take advantage of strategic brand acquisitions in the near term."

33.    On August 13, 2003, aaiPharma filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed its previously announced financial results. The Company also stated:

In the opinion of management, all adjustments (consisting of normal recurring adjustments) considered necessary for fair presentation have been included in these interim financial statements. Operating results for the interim periods

presented are not necessarily indicative of the results that may be expected for the full year.

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes.

34.    On August 21, 2003, aaiPharma issued a press release in response to a third-party's offer to buy CIMA.  More specifically, the Company confirmed that it had received notification from CIMA that CIMA had received an unsolicited proposal from Cephalon Inc., concerning its potential interest in acquiring CIMA.  As previously reported, under its agreement with aaiPharma, CIMA could not enter into negotiations with a third-party concerning a proposed alternative transaction unless the CIMA board of directors concluded in good faith, after receiving advice from its advisors and taking into account all legal, financial, regulatory and other aspects, including the likelihood of the consummation of such proposed transaction, that the proposed transaction is more favorable to the CIMA stockholders than the transaction with aaiPharma.

35.    Commenting on this, Tabbiner stated:

"We are confident that the definitive merger agreement entered into by aaiPharma and CIMA offers superior value to CIMA shareholders[.]" . . . "Our transaction will be immediately and substantially accretive to CIMA shareholders.  Moreover, it will be a strategic combination that creates a more powerful science-based specialty pharmaceutical company with enhanced future growth prospects and the potential to generate significant value for shareholders for both companies over the long term."

. . . "Our merger with CIMA will accelerate the commercialization of CIMA's proprietary pipeline and allow our combined company to leverage CIMA's proprietary orally disintegrating tablet technology with aaiPharma's brands to create future products that provide significantly higher future earnings growth potential through the substantial revenue opportunities of the combined pipeline.  Because the value that our proposed stock-for-stock merger offers to CIMA stockholders is greater than what Cephalon is proposing, we do not foresee making any changes to the merger agreement in response to Cephalon's proposal."

36.     On September 11, 2003, aaiPharma issued a statement in response to CIMA's announcement of a new letter from Cephalon. The Company confirmed that it had been notified that CIMA received a letter from Cephalon proposing to enter into discussions toward an alternative transaction. Commenting on this, Tabbiner stated: "We believe the merger between aaiPharma and CIMA Labs will create a combined company with tremendous growth potential[.] ... We are committed to completing the transaction with CIMA under the terms agreed upon."

37.     On October 22, 2003, aaiPharma announced that it had agreed to acquire a portfolio of pain management products from Elan Corporation, plc companies for $100 million, to be paid at closing. These products consist of three brands of Schedule II pain products -- Roxicodone® (oxycodone hydrochloride) tablets and oral solutions, Oramorph® SR (morphine sulfate sustained-release) tablets, and Roxanol™ (morphine sulfate) oral solutions. aaiPharma had also agreed to acquire a non-scheduled pain management product, Duraclon® (clonidine hydrochloride injection), from Elan Corporation, plc companies, as part of the same transaction. Commenting on this transaction, Tabbiner stated: "These products are an excellent fit with our current sales and promotion focus and, upon completion of the transaction, will provide us added depth in the $4.5 billion moderate to severe pain category[.] ... We look forward to discussing this **accretive transaction** in greater detail during our third quarter earnings call later this week." (Emphasis added.)

38.     Also on October 22, 2003, aaiPharma announced its financial results for the third quarter and nine-month period ended September 30, 2003. Total revenues for the third quarter ended September 30, 2003 increased 16% to $71.0 million as compared to $61.2 million recorded in the comparable 2002 period. Net income for the 2003 third quarter rose 26% to $8.9 million, or $0.31 per diluted share, versus $7.1 million, or $0.25 per diluted share, for the 2002

third quarter. For the first nine months of 2003, total revenues increased 22% over the year-ago period to $205.8 million, compared with total revenues of $168.3 million in the first nine months of 2002. Net income for the 2003 nine-month period was $24.1 million, or $0.84 per diluted share, more than double the net income for the 2002 nine-month period of $10.0 million, or $0.35 per diluted share. The Company also reported cash and cash equivalents of $11.1 million at September 30, 2003, as compared to $8.1 million at June 30, 2003, after the repayment of an additional $12.5 million of debt during the third quarter of 2003. For the nine months ended September 30, 2003, the Company had repaid a total of $29.5 million of debt. In the third quarter, net cash provided by operating activities was $19.6 million and capital expenditures were $3.4 million.

39.     Commenting on these results, Tabbiner stated:

"We are pleased with our third quarter financial results reflecting another period of strong and consistent year-over-year growth[.]"

. . . "The recent approval and national launch of Darvocet A500™ is a significant milestone for our business. Darvocet A500™ marks the first major pharmaceutical launch undertaken by aaiPharma, and we are very pleased with the initial feedback we are receiving from physicians about the need for this lower acetaminophen alternative to the current Darvocet™ offering. Darvocet A500™, coupled with our planned acquisition of the pain portfolio from Elan, underscores our strategy to focus our efforts on the pain management category and will provide us with a complementary portfolio of products that we can leverage with our growing sales and marketing organization."

40.     Lastly, the Company also provided the following outlook: "Based on current trends, the Company continues to expect diluted earnings per share for 2003 to be between $1.11 and $1.17, and the net revenue range to be between $280 million and $290 million."

41.     On October 23, 2003, aaiPharma held a conference call with investors and analysts with respect to its third quarter earnings announcement. During the conference call,

defendant reaffirmed their previously announced financial results. Additionally, Tabbiner, with respect to inventory levels at the Company stated:

> Regarding wholesale inventory levels, we continue to be very comfortable with the overall inventory levels for our products. According to the most recent IMS report and our internal tracking process, the discontinued injectable (indiscernible) 100 packs continue to be pulled from the channel, much as we expected, with approximately five months of inventory remaining in the channel.

42. On November 14, 2003, aaiPharma filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed its previously announced financial results. The Company also stated:

> In the opinion of management, all adjustments (consisting of normal recurring adjustments) considered necessary for fair presentation have been included in these interim financial statements. Operating results for the interim periods presented are not necessarily indicative of the results that may be expected for the full year.

> The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes.

43. On November 3, 2003, aaiPharma announced that its merger agreement with CIMA had been terminated, and it would continue to focus on its independent growth strategy. aaiPharma had received the $11.5 million termination fee from CIMA, as provided in the terminated merger agreement, against which merger-related expenses would be applied. Commenting on this, Tabbiner stated:

> "We are eager to refocus our full energies on pursuing our growth strategy as an independent company[.]" . . . "Having just reported solid performance in our third quarter, the recent approval and national launch of Darvocet A500, and the agreement to acquire a portfolio of pain products, including Roxicodone and Oramorph SR, we are confident that aaiPharma will continue its strong growth as we successfully execute our science-based specialty pharmaceutical strategy."

> ... "Having reduced our debt by $80 million as of September 2003, we have enhanced our financial flexibility and are well positioned to expand our branded pharmaceutical products franchise, focusing more intently on the pain

management marketplace. We will also continue to invest in research to drive our pipeline forward and the infrastructure needed to achieve our business goals."

44. On December 2, 2003, aaiPharma announced that it had received clearance under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 by the Federal Trade Commission for and completed the acquisition of Roxicodone®, Oramorph® SR, and Roxanol™ and Duraclon® from Elan Corporation, PLC companies. Commenting on this, Tabbiner stated:

> "These products are an excellent fit with our current sales and promotion focus in pain management and allow us to expand into the moderate to severe pain market[.]" . . . "These products, coupled with the recent launch of Darvocet A500™, position aaiPharma for continued growth in the pain management category."

45. On December 12, 2003, aaiPharma announced its financial guidance for 2004 as follows:

> The Company believes that the financial guidance presented today reflects its overall strategy of combining therapeutically-relevant product acquisitions with its scientific expertise to drive long-term growth. At the time of this disclosure, the Company believes that it is well-positioned to achieve its financial guidance for 2004.
>
> Based upon the Company's current business performance and the overall outlook for 2004, aaiPharma expects net revenue for 2004 to be in the range of $340 million to $355 million and earnings to be in the range of $1.45 to $1.52 per diluted share. Pharmaceutical products, product development and development services revenues for 2004 are expected to be within the following ranges:

|  | 2004 Ranges (millions) |
|---|---|
| **Pharmaceutical Products** | **$234 to $245** |
| **Product Development** | **$18 to $20** |
| **Development Services** | **$88 to $90** |
|  |  |
| **Total Revenues** | **$340 to $355** |

> 2004 financial guidance reflects an expected continued ramp-up in performance for the newly introduced Darvocet A500™. Since its launch on October 6, 2003, scripts have trended as expected, there has been no degradation in Darvocet-NO 100 script volume and the C-IV class of pain products has grown overall.
>
> aaiPharma recently completed the acquisition of four C-11 pain products: Oramorph® SR, Roxicodone®, Roxanol™ and Duraclon®. The launch and

marketing promotion of these products are planned to begin in the first quarter of 2004. The Company has risk-adjusted its 2004 expectations for these products by factoring in the potential impact of additional generic competition for Roxicodone®, along with the potential benefit from enhanced promotion in Oramorph® SR. Inclusive of this anticipated generic entry, 2004 revenues for this portfolio are expected to be in the range of $40 million to $45 million.

In addition to the potential for generic competition for Roxicodone®, the Company's 2004 financial guidance assumes that a generic formulation of its Brethine® injectable product will enter the market in the second half of the year.

aaiPharma anticipates 2004 gross margins as a percentage of revenues to increase modestly over those expected in 2003. Research and development spending is forecasted to increase and to be in the range of $25 million to $27 million. During 2004, selling, general and administrative expenses are projected to increase over 2003 levels and to be in the range of 28% to 30% of revenues as the Company continues to focus its promotional efforts on its growing portfolio of pain products. For the full year of 2004, the Company's tax rate is expected to be in the range of 36% to 37%. (Emphasis in original)

46.     On December 19, 2003, aaiPharma sought to further prop its stock price by issuing the following press release, entitled "aaiPharma Inc. Reiterates Positive Performance And Outlook For Darvon And Darvocet-N Franchise":

WILMINGTON, N.C., Dec. 19 /PRNewswire-FirstCall/ -- aaiPharma (Nasdaq: AAII) today reiterated its outlook on the performance of the Darvon(R) and Darvocet-N(R) franchise and reaffirmed that the Company expects an annualized run rate of $55 to $60 million for the products.

"We are very pleased with the continued success we are experiencing in the marketplace with our Darvon(R) and Darvocet-N(R) franchise and are gearing up for the launch of a new, broader promotional campaign for 2003," stated Mr. David Hurley, President of the Pharmaceuticals Division of aaiPharma. "We continue to see a positive trend in the IMS Retail Provider/Provider Perspective (RP/PP) data regarding sales of extended units. Since we began actively promoting the brands in June of this year, the market share for Darvon(R)/Darvocet-N(R) extended units has steadily increased from 5.3 percent in June to 6.3 percent in October 2002, the most current IMS RP/PP data available to us. Our share of extended units is a key benchmark for us as we measure our success in increasing our brand penetration in the marketplace because it accounts for the total number of pills sold. In addition, IMS RP/PP data provides us with the most complete view of the marketplace. November IMS RP/PP data will be available in January."

The Company indicated that its sales representatives and promotional activities are having the expected and desired impact in the marketplace. According to Mr.

Hurley, "As we further increase our promotional activities throughout the year and continue to ramp up our sales force to 150 representatives by the end of 2003, we expect these positive trends to continue. As we have stated previously, we also plan to launch two line extensions to the Darvon(R)/Darvocet-N(R) brand franchise per year for the next three years, starting in 2003. The current portfolio provides us with an excellent platform for launching new products into the pain market and is establishing aaiPharma as an important participant in the pain marketplace."

47. On January 20, 2004, aaiPharma stock closed trading at $31.50 per share, its 52 high and the highest share price during the Class Period. At this price, the market placed a lofty valuation on aaiPharma of $877,000,000, which reflected the market's great optimism as to its claimed financial and business strength as well as its growth prospects.

48. The statements contained in ¶¶ 23-47 were each materially false and misleading because the defendants failed to disclose and indicate: (1) that the Company's core business plan was deteriorating; (2) that AaiPharma's financial results during the Class Period were artificially inflated due to defendants' improper and undisclosed practice of "channel stuffing" or unloading inventory of Darvocet, a painkiller, and Brethine onto wholesalers in order to overstate revenues; (3) that defendants failed to adequately reserve for product returns; (4) that the Company was improperly recognizing revenue, in violation of Generally Accepted Accounting Principles ("GAAP"), from sales that were not complete; (5) that defendants knew and ignored, or were reckless in not knowing, the facts which indicated that the above particularized press releases, public statements, and filings with the SEC which were disseminated to the investing public, including Savings Plan participants, during the Class Period, were materially false and misleading for the reasons set forth above; and (6) that as a result, the Company's financial results were materially inflated at all relevant times in need of restatement.

## THE TRUTH BEGINS TO EMERGE

49.     Only a few weeks after trading at its 52 week high of $31.50 per-share, the stock of aaiPharma would begin a severe downward turn based upon a series of revelations that shocked the market and sent aaiPharma into a death spiral on the brink of collapse. Indeed, only six weeks after trading at $31.50 per share, aaiPharma stock sank to a low $6.53 on March 31, 2004, erasing over $500 million in market capitalization and millions of dollars in the value of the stock held by participants in the Savings Plan.

50.     On February 5, 2004 aaiPharma announced in a press release that the Company was setting aside money to pay for refunds on older medicines after an unusually high return rate in the fourth quarter. The press release stated in pertinent part:

> **Net revenues from product sales in the fourth quarter were negatively impacted by product returns of Brethine® injectable 100 pack sold during 2002, which were approximately $4.8 million in the quarter, a significantly greater level of returns than experienced in any prior quarter... In the fourth quarter, return reserves were increased based on the Company's recent experience**. The most significant addition to return reserves in the quarter was attributable to Brethine® 100 packs. Two of the Company's three major U.S. wholesalers have now depleted the majority of their 100 pack inventory. In addition, following the licensure of the exclusive rights to AaiPharma's 25 mg, 75 mg and 100 mg azathioprine products to Salix in the fourth quarter, the Company processed actual returns and established a returns reserve totaling $3.9 million, which covers the full amount of the remaining inventory of these products in the distribution chain. The aggregate effect of product returns and additions to product returns reserves reduced fourth quarter net revenues by $15.9 million.
>
> Income from operations for the 2003 fourth quarter decreased 8% to $15.7 million compared with $17.0 million in the prior year period. Fourth quarter earnings advanced to $0.34 per diluted share, a 31% improvement over the 2002 period. The decline in income from operations for the 2003 fourth quarter was due primarily to the product returns discussed above and the investment in the accelerated build out of a national sales force. The increase in other income was primarily a result of the fees, net of merger-related fees and expenses, generated from the termination of the merger agreement with CIMA and proceeds related to the Company's investment in Endeavor Pharmaceuticals, which resulted from the acquisition of the assets of Endeavor Pharmaceuticals by Barr Laboratories.

During the fourth quarter of 2003, the Company announced the termination of its merger agreement with CIMA. As a result, the Company received an $11.5 million termination fee from CIMA, as provided in the terminated merger agreement, against which $5.9 million of merger-related fees and expenses were applied.

51.     On news of this, shares of aaiPharma fell 23%, or $6.36 per share to close at $21.24 per share on extremely heavy volume. A February 5, 2004 article published by Reuters stated:

> Shares of AaiPharma Inc. plunged 21 percent on Thursday after the drugmaker issued a disappointing earnings forecast and an analyst cut his rating on the stock. The Wilmington, North Carolina-based company projected earnings of 27 cents to 30 cents per share for the first quarter, below the average Wall Street estimate of 34 cents.
>
> First Albany analyst Adam Greene lowered his rating on AaiPharma's stock to "neutral" from "buy," advising investors to take a wait-and-see stance.
>
> In a research note, Green wrote that AaiPharma's $15.9 million reserve for product returns "is likely to fuel further speculation regarding the quality of sales and earnings."

52.     It soon became clear, however, that the Company's troublesome February 5, 2004 disclosure was only the tip of the iceberg. Shortly after aaiPharma announced creation of the $15.9 million reserve for product returns; it reported on February 12, 2004, that its chief operating officer, David M. Hurley, was leaving to become president of a start-up drug company. Hurley had been with aaiPharma for two years and had held the COO job for only five weeks. The Company's stock dropped 6.4%, to close at $18.70.

53.     On March 1, 2004, the Company further shocked the market by disclosing that it had uncovered "unusual sales" and two of its most important product lines, sending the shares plummeting even further. As reported in a The Street.com article entitled "Sales Disclosure Pummels aaiPharma":

Shares of aaiPharma were pounded Monday following the company's announcement it had detected "unusual sales" in two product lines during the second half of 2003.

**At the close, the drugmaker's stock was off $5.52, or 36.1%, to $9.76, having closed at $31.50 just six weeks ago.** As a consequence of this discovery, the Wilmington, N.C.-based company withdrew financial guidance for the first quarter and full-year 2004, saying the irregularities would "materially affect" previous financial estimates.

It also said it may have to make "an adjustment in the 2003 financial results" depending on the results of an investigation by a group of independent directors and an outside law firm.

\*\*\*

The company's investigation concerns the sales of Darvocet, a painkiller, and Brethine, a treatment for the wheezing and lung discomfort associated with asthma, emphysema and bronchitis. The company said the problems came to light after it had released its 2003 financial report Feb. 5.

"The company will not comment further on these matters until the independent inquiry has been concluded and the results of the inquiry have been publicly reported," said Dr. Frederick D. Sancilio, aaiPharma's chairman, in a prepared statement.

\*\*\*

Three weeks ago, aaiPharma announced it had set aside a $15.9 million reserve against revenue in the fourth quarter of 2003 to account for products that are returned. One of those products was Brethine, whose returns, the company said, were "significantly greater" in the fourth quarter than in any other quarter. **When it announced the reserve, company executives said they were comfortable with inventory levels among wholesalers.**

54.     On March 29, 2004, aaiPharma, which delayed its annual regulatory filing because it discovered sales "abnormalities," announced that its chief executive Philip Tabbiner resigned and that Frederick Sancilio, who founded the company and served as chairman and CEO from 1979 until 2002, would again assume the CEO position. On this news, shares of aaiPharma close down 5% to $8.01.

55.     Just one day later, on March 31, 2004, shares in aaiPharma were further devastated by the announcement that the Company would not file its Form 10k annual report with the SEC within the 15 date extension period, that this failure put it in default under its $175 million senior subordinated notes, and that it was in danger of being delisted from trading on the NASDAQ market. On this news, aaiPharma shares plunged once more, closing the trading day down more than 20%, at a 52-week low of $6.56.

56.     As chronicled in a March 31, 2004, Reuters article

NEW YORK, March 31 (Reuters) - Shares of AaiPharma Inc. (NasdaqNM:AAII - News) slumped more than 20 percent on Wednesday after it said its recent failure to file its annual report with securities regulators would put it in default under its credit facility.

The troubled drugmaker said it might receive a subpoena about its sales practices and its stock may be delisted.

The company previously disclosed it would not be able to file its 2003 Form 10-K, an annual document that companies must submit to the U.S. Securities and Exchange Commission. It discovered "abnormalities" with 2003 sales of its asthma treatment and its painkillers, necessitating the delay.

AaiPharma said late on Tuesday that it would not submit the 10-K within a 15-day extension period, and that failure to file it on a timely basis would result in default under the company's senior secured credit facility.

The company is not permitted to make any borrowings under the revolving credit facility.

In addition, failure to timely file the Form 10-K may result in a default under its $175 million senior subordinated notes due 2010 if the filing does not occur within 60 days after notice.

An interest payment of $9.6 million is due Thursday on the senior subordinated notes. Under the terms of the credit facility, the lenders have the right to block the company from making that interest payment.

AaiPharma said it is working to develop a plan with its lenders that would allow the interest payment to be made by April 30.

The company said the Nasdaq stock market could delist its stock on April 8 unless it requests a hearing, which it intends to do.

The company said it received notice from the Nasdaq stock market that its shares will be delisted on April 8 unless it requests a hearing, which it intends to do. The company, based in Wilmington, North Carolina, has been advised by the Office of the United States Attorney for the Western District of North Carolina that the company may receive a subpoena from the SEC, a grand jury subpoena from the U.S. Attorney's Office relating to the sales activity, or both.

57.     The following day, AaiPharma confirmed its earlier intimation that it may have to restate earnings, and announced that it expected to restate its earnings for the third quarter ended Sept. 30, 2003.  It also said that it may have to restate other quarterly reports filed in 2003, as well as its 2003 earnings release **issued only weeks prior on Feb. 5, 2004**.

58.     The devastation of aaiPharma stock and the financial havoc to Plan participants as a result of Defendants' fraud and breaches fiduciary duties is apparent from the stock's daily trading chart for the one-year period ending March 31, 2004.



59.     The fact that aaiPharma will restate its financial statements for all or part of 2003 conclusively demonstrates that: 1) the financial statements were false and misleading <u>at the time they were issued</u>; and 2) the misstatements were material.

60.     The relevant authoritative pronouncement regarding accounting changes is APB Opinion No. 20[2], which provides that changes in accounting estimates or knowledge gained subsequent to the issuance of financial statements does not require a restatement of previously issued financial statements:

> Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts <u>that existed at the time the financial statements were prepared</u>. In contrast, a change in accounting estimate results from new information or subsequent developments and accordingly from better insight or improved judgment. Thus, an error is distinguishable from a change in estimate. (emphasis added). [APB No. 20 ¶ 13]

The Board determined that a change in accounting estimate would not require a restatement of previously reported results, but an error would require such a restatement:

> A change in estimate should not be accounted for by restating amounts reported in the financial statements or prior periods . . . [APB No. 20 ¶ 31].

> *     *     *

> The Board concludes that correction of an error in the financial statements of a prior period discovered subsequent to their issuance should be reported as a prior period adjustment. [APB No. 20 ¶ 36].

Similarly, APB Opinion No. 28 provides that changes in accounting estimates do not provide a basis for restatement of interim financial statements[3]:

> No restatement of previously reported interim information should be made for changes in estimates . . . [APB No. 28 ¶ 26].

---

[2]     ACCOUNTING CHANGES, APB Opinion No. 20, Accounting Principles Board (1971).
[3]     INTERIM FINANCIAL REPORTING, APB Opinion No. 28, Accounting Principles Board (1973).

61.     Thus, only material errors need be restated, demonstrating that the falsifications contained in the Company's financial statements were material.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

62.     ERISA section 404(a)(1))(A) imposes on a Plan fiduciary a duty of loyalty – that is, a duty to "discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries...." Section 404(a)(1))(B) also imposes on a Plan fiduciary a duty of prudence – that is, a duty to "discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims...."

63.     A Plan fiduciary's duties of loyalty and prudence include a duty to disclose and inform.  This duty entails:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.  This duty to disclose and inform recognizes the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the participants and beneficiaries, on the other.  In a Plan with various funds available for investment, this duty to inform and disclose also includes:  (1) the duty to impart to Plan participants material information of which the fiduciary has or should have knowledge that is sufficient to apprise the average Plan participant of the risks associated with investing in any particular fund; and  (2) the duty not to make material misrepresentations.

64.     During the Class Period and before, the defendants breached their fiduciary duties to disclose and inform with respect to the Savings Plan's use of employer stock as a Plan investment. From the beginning of the Class Period and before, any investment in employer stock in the Savings Plan was an undiversified investment in a single company's stock whose public price was based on expectations of continued rapid growth. As a result, any such investment carried with it an inherently high degree of risk. These inherent risks made the defendants' duty to provide complete and accurate information about investing in Company stock in the Savings Plan even more important than would otherwise be the case. Rather than providing complete and accurate information to the Savings Plan' participants and beneficiaries regarding the risks of investing in the Company stock fund in the Savings Plan, defendants withheld and concealed material information during the Class Period and before as set forth above, and instead actively misled the participants and beneficiaries of the Savings Plan about the Company's earnings prospects and business condition, thereby encouraging participants and beneficiaries of the Savings Plan to continue to make and to maintain substantial investments in Company stock in the Savings Plan.

65.     A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Savings Plan, including employer securities, to ensure that each investment is a suitable option for the Savings Plan. During the Class Period, none of the Defendants could have reasonably made a determination that aaiPharma stock was a suitable investment for the Savings Plan.

66.     The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a Plan with an

"eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Savings Plan sponsor.

67.     Defendants breached their duty to avoid conflicts of interests and to promptly resolve them when they occur by continuing to offer Company stock as a Plan investment option during the Class Period.

68.     The also breached their fiduciary duties under ERISA by failing to lift the bar precluding members of the Savings Plan from selling their aaiPharma shares prior to termination or retirement when aaiPharma was announcing shockingly bad news about its financial reporting, which Defendants were aware would cause aaiPharma's share price to plummet.

69.     Plaintiff further contends that the Savings Plan suffered a loss, and plaintiff and the other class members were damaged, by defendants' above-described conduct during the Class Period because that conduct fundamentally deceived plaintiffs and the other class members about the prudence of making and maintaining investments in aaiPharma stock, and that, in making and maintaining investments in aaiPharma stock, plaintiff and the other Class members relied to their detriment upon defendants' materially deceptive statements, acts and omissions.

## COUNT I
## NO DIVERSIFICATION
### (Breaches of Fiduciary and Co-Fiduciary Duties In Violation of ERISA
### 29 U.S.C. §§ 1104 (a)(1)(A)-(D), 29 U.S.C. § 11050)
### (Against All Defendants)

70.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if set forth fully herein.

71.     As fiduciaries, pursuant to 29 U.S.C. § 1104(a), each Defendant was required to:

> [D]ischarge his duties with respect to a Plan solely in the interest
> of the participants and beneficiaries and ---

(A) for the exclusive purpose of

> (i) providing benefits to participants and their beneficiaries; . . . .

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; . . . .

(D) in accordance with the documents and instruments governing the Savings Plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

62.     Each of the Defendants was also a co-fiduciary of the other Defendants. 29 U.S.C. § 1105. Under that section, each fiduciary is liable for the acts of another fiduciary:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

> (2) if, by his failure to comply with section 404(a)(1) [29 USC § 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

72.     All Defendants breached the fiduciary duties they owed Plaintiffs, the Class and the Savings Plan by failing to lift the bar precluding members of the Savings Plan from selling their aaiPharma shares prior to termination or retirement.

73.     As a result of the trading bar, Class Members were unable to sell their aaiPharma stock during the crucial period of time in which the stock dropped precipitously during the Class Period.

74.     In light of the extraordinary circumstances in which the Defendants knew or should have known that aaiPharma (and its over-valued stock) were on the brink of collapse, the

Defendants had a fiduciary duty to lift the bar to allow Plan participants and beneficiaries to sell off their aaiPharma stock.

75.     Each Defendant knowingly participated in these fiduciary breaches of its co-fiduciaries, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure to comply with the provisions of 29 U.S.C. § 1104(a), and had knowledge of the breaches of its co-fiduciaries and failed to make reasonable efforts to remedy such breaches.

76.     The above-described breaches of fiduciary duty give rise to the presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Savings Plan would not have maintained their investments in aaiPharma and would have instead moved their Plan assets to the most profitable alternative investment available.  This remedy will restore the values of the Savings Plan's assets to what they would have been if the Savings Plan had been properly administered.

77.     As a direct and proximate result of enforcing the trading bar in violation of ERISA as described above, the Plaintiffs, the Savings Plan and the Class lost millions of dollars.

78.     Pursuant to 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Savings Plan that occurred in violation of the Defendants' fiduciary duties.

## COUNT II

### WRONGFULLY PROMOTING THE PURCHASE OF AAIPHARMA STOCK
**(Breaches of Fiduciary and Co-Fiduciary Duties In Violation of ERISA
29 U.S.C. §§ 1104 (a)(1)(A)-(D), 29 U.S.C. § 11050)
(Against The aaiPharma Defendants)**

79.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if set forth fully herein.

80.     Each of the aaiPharma Defendants acted as a fiduciary under 29 U.S.C. § 1002(21)(A) with respect to the wrongful promotion of aaiPharma stock by Plan participants and beneficiaries, which was an action that was directed at and directly impacted the Savings Plan and the beneficiaries of the Savings Plan.

81.     Each of the aaiPharma Defendants was also a co-fiduciary of the other Defendants under 29 U.S.C. § 1105 with respect to the wrongful promotion of aaiPharma stock by Plan participants and beneficiaries, which was an action that was directed at and directly impacted the Savings Plan and the beneficiaries of the Savings Plan.

82.     In addition to their other fiduciary duties, ERISA fiduciaries also have a duty not to mislead participants and a duty to voluntarily disclose truthful information in order to ensure that participants have all the information they need to exercise their rights under the Savings Plan.

83.     The aaiPharma Defendants repeatedly breached the fiduciary duties they owed Plaintiffs, the Class and the Savings Plan when they (i) offered aaiPharma stock as an investment option for employee-contributions to the Savings Plan; (ii) encouraged and induced employees to invest their Plan contributions in aaiPharma stock and (iii) misrepresented and failed to disclose the true financial and business condition of aaiPharma, as well as its growth prospects – all at a time when the aaiPharma Defendants knew or should have known that aaiPharma's stock price was built on fraud and that aaiPharma stock was not a prudent investment.

84.     Each of the aaiPharma Defendants knowingly participated in these fiduciary breaches of its co-fiduciaries, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure to comply with the provisions of 29 U.S.C. § 1104(a), and had knowledge of the breaches of its co-fiduciaries and failed to make reasonable efforts to remedy such breaches.

85.     The above-described breaches of fiduciary duty give rise to the presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Savings Plan would not have maintained their investments in aaiPharma and would have instead moved their Plan assets to the most profitable alternative investment available.

86.     As a direct and proximate result of these breaches of fiduciary duties in violation of ERISA as described above, the Plaintiff, the Savings Plan and the Class lost millions of dollars.

87.     Pursuant to 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Savings Plan caused by their breaches of fiduciary duties.


## COUNT III
## USING AAIPHARMA STOCK FOR MATCHING CONTRIBUTIONS
(Breaches of Fiduciary and Co-Fiduciary Duties In Violation Of ERISA, 29 U.S.C. §§ 1104 (a)(1)(A)-(D), 29 U.S.C. § 11050)
(Against The aaiPharma Defendants)

88.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if set forth fully herein.

89.     Each of the aaiPharma Defendants acted as a fiduciary under 29 U.S.C. § 1002(21)(A) with respect to the wrongful use of aaiPharma stock for matching contributions to Plan participants and beneficiaries, which was an action that was directed at and directly impacted the Savings Plan and the beneficiaries of the Savings Plan.

90.     Each of the aaiPharma Defendants was also a co-fiduciary of the other Defendants under 29 U.S.C. § 1105 with respect to the wrongful use of aaiPharma stock for matching contributions to Plan participants and beneficiaries, which was an action that was directed at and directly impacted the Savings Plan and the beneficiaries of the Savings Plan.

91.     The aaiPharma Defendants repeatedly breached the fiduciary duties they owed Plaintiffs, the Class and the Savings Plan by making their employer contributions in the form of aaiPharma stock when they knew or should have known that aaiPharma's high stock price was built on fraud and that aaiPharma stock was not a prudent investment.

92.     Regardless of what the Savings Plan said, throughout the Class Period the aaiPharma Defendants had a duty under 29 U.S.C. § 1104(a)(D) to (i) cease making their contributions in the form of aaiPharma stock and (ii) allow all Plan participants to sell the aaiPharma stock that they had received as aaiPharma's employer contributions.

93.     Each of the aaiPharma Defendants knowingly participated in these fiduciary breaches of its co-fiduciaries, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure to comply with the provisions of 29 U.S.C. § 1104(a), and had knowledge of the breaches of its co-fiduciaries and failed to make reasonable efforts to remedy such breaches.

94.     Additionally, because it was a party in interest to the Savings Plan within the meaning of 29 U.S.C. § 1132(a)(3), aaiPharma also had a separate duty under 29 U.S.C. § 1132(a)(3) to refrain from participating in any breaches of fiduciary duty with respect to the Savings Plan when, as here, it had actual or constructive knowledge of such breaches.

95.     The above-described breaches of fiduciary duty give rise to the presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Savings Plan would not have maintained their investments in aaiPharma and would have instead moved their Plan assets to the most profitable alternative investment available.

96.     As a direct and proximate result of in violation of ERISA as described above, the Plaintiffs, the Savings Plan and the Class lost millions of dollars.

97.     Pursuant to 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Savings Plan caused by the aaiPharma Defendants' breach of fiduciary duties as detailed above.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for relief as follows:

A.     That this Court certify this action as a class action under Rule 23(b)(1), 23(b)(2) and 23(b)(3);

B.     That this Court declares that Defendants have violated the duties, responsibilities and obligations imposed upon it as a fiduciary by ERISA;

C.     That this Court order defendants to restore to the aaiPharma Retirement and Savings Plan on behalf of each member of the Class the amount of overpayment made for the purchase of aaiPharma stock, plus interest;

D.     That this Court order defendants to reimburse the Savings Plan and each member of the Class for all damages occurring as a result of the bar precluding trading their aaiPharma stock and to award damages related to purchases made during the Class Period or to rescind the purchases of aaiPharma Stock made by the Savings Plan and each member of the Class;

E.     That this Court award to plaintiffs reasonable costs and attorneys' fees; and

F.     That this Court grant such other relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 9, 2004

_____
William E. Moore, Jr.

Gray, Layton, Kersh, Solomon, Sigmon,
Furr & Smith, PA
P. O. Box 2636
Gastonia, NC   28053-2636
Tel. (704) 865-4400
Fax.: (704)-854-8313
bmoore@gastonlegal.com
State Bar No. 9962

_____
Arcangela M. Mazzariello
P.O. Box 1574
402 South Broad Street
Gastonia, North Carolina 28053-1574
Tel:  (704) 864-8883
Fax: (704) 864-8384
AMMazzariello@aol.com
Stqate Bar No. 23846

## OF COUNSEL

Jonathan M. Plasse
Christopher J. Keller
Goodkind Labaton Rudoff
 & Sucharow Llp
100 Park Avenue
New York, New York 10017
Tel:  (212) 907-0700
Fax:  (212) 818-0477